Richard L. WATERS, Plaintiff,

v.

Edwin MEESE III, Attorney General, United States Department of Justice, Defendant.

Civ. A. No. 87–1343 JHP.

United States District Court, District of Columbia.

April 25, 1988.

Jennifer R. Levin, Joseph B. Scott, Washington, D.C., for plaintiff.

Wilma A. Lewis, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

JOHN H. PRATT, District Judge.

This action stems from an investigation undertaken by the Civil Rights Division ("Division" or "government") of the United

States Department of Justice ("Department") into certain uses of leave time granted to Richard Waters, a Division employee. Waters claims that the manner in which the Division conducted the investigation violated his rights under the Privacy Act ("the Act"), 5 U.S.C. § 552a (1982). He has thus initiated this action for money damages pursuant to the Act. *Id.* § 552a(g)(1). Presently before the court are the parties' cross motions for summary judgment, which have been fully briefed. Because the court is convinced that plaintiff has not satisfied the prerequisites for relief under the Privacy Act, and for the additional reasons set forth below, defendant's cross-motion for summary judgment is granted, and plaintiff's motion is denied.

### Background

The material facts underlying the parties' dispute are not in dispute.[1] Plaintiff Richard Waters is a law school graduate who is, and was at all times relevant to this action, a senior program analyst in the Coordination and Review Section of the Department's Civil Rights Division. In late January or early February 1986, Waters requested a combination of sick leave, annual leave and advanced annual leave from February 4 through February 26, 1986, for the express purpose of preparing for and taking the Pennsylvania Bar Examination. James D. Bennett, a supervisory program analyst and Waters' supervisor, approved Waters' request for annual and advanced annual leave in light of the purpose expressed. Waters returned to work as scheduled on February 27, 1986, and proceeded to request administrative leave, this time for the purpose of complying with a summons for petit jury duty in the United States District Court for the District of Columbia. Bennett acceded to the request for administrative leave which would extend from March 3 through March 14, 1986,

a time frame later enlarged through Friday, March 21, 1986.

According to defendant's recitation, Waters did not return to work as scheduled on March 24, 1986. Inquiry by Division officials turned up information which led them to question Waters' actual use of the approved administrative leave. Accordingly, when Waters returned to work on March 24, 1986, Bennett asked him to account in writing for his whereabouts on the dates during which he was to be available for jury duty. Thus began an investigation into Waters' use of leave time, an investigation which ultimately carried over to questions pertaining to Waters' use of the February leave period as well.

On July 9, 1986, Kathleen Murphy, then the Chief of the Division's Personnel and Training Unit, acting at the behest of Bennett, wrote to the Secretary/Treasurer of the Pennsylvania Board of Law Examiners requesting confirmation of Waters' attendance at the February 1986 Pennsylvania Bar Examination. The letter stated that Waters' supervisor, "[f]or reasons that I cannot disclose at this time, ... has reason to believe that Richard Waters did not take the bar at this period of time." Letter of July 9, 1986, Attachment B to Plaintiff's Motion for Summary Judgment. The letter went on to warn that the supervisor "intends to take some form of disciplinary action," perhaps including "removal from federal service," if Waters' attendance could not be confirmed. *Id.*

By correspondence dated July 21, 1986, the Secretary/Treasurer responded to this rather ominous letter by confirming Waters' presence at the two-day February bar examination. At no time during the investigation was Waters informed, by Division employees or otherwise, that his use of the February leave period was under scrutiny. Waters learned of the inquiry months later,

1. The parties harbor disputes only as to which of the stated facts are relevant to resolution of the pending motions. Plaintiff does not take issue with any of the Department's factual allegations; instead, he regards much of the government's recitation as "irrelevant to the issues in this case," and hence not deserving of a response. Plaintiff's Memorandum in Opposition

to Defendant's Cross–Motion and in Reply to Defendant's Opposition to Plaintiff's Motion at 1 n. 1. As discussed more fully below, we consider much of this allegedly extraneous background to be highly relevant. The discussion provided in the text includes those undisputed facts which the court deems relevant for present purposes.

in the course of an unrelated correspondence with officials of the Pennsylvania Board of Law Examiners. Having happened upon this information, Waters, through his lawyer, promptly wrote a letter to the Deputy Assistant Attorney General of the Division, requesting copies of any correspondence between Ms. Murphy and the Secretary/Treasurer. By letter dated December 24, 1986, the Deputy provided the copies to Waters, in addition to a copy of another letter dated December 24, 1986, which was submitted to the Secretary/Treasurer by another executive officer of the Division. This letter assured the Bar Examiners that the July 9 correspondence was merely an attempt to verify Waters' whereabouts on the dates in question. The letter added, in a tone considerably less threatening than the July correspondence, that Waters was and always has been in good standing as a federal employee.

Waters commenced this civil action against the government on May 19, 1987. His sole claim is that the Division's conduct during the investigation violated that provision of the Privacy Act which requires a federal agency to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." 5 U.S.C. § 552a(e)(2). Waters contends, in essence, that this statutory provision required the Department to seek information pertaining to the February leave directly from him before seeking the same information from third parties. It is undisputed that Waters was neither consulted on this matter nor informed of the pending investigation prior to the Division's July 1986 contact with officials of the Pennsylvania Board of Law Examiners. The parties' cross-motions for summary judgment have fully addressed all outstanding issues.[2]

### Discussion

Courts have recognized four prerequisites to maintaining a civil action for damages under the Privacy Act, all of which are embedded in the plain language of the Act itself. A plaintiff must establish (1) that the defendant agency failed to elicit information directly from plaintiff "to the greatest extent practicable," 552 U.S.C. § 552a(e)(2); (2) that defendant's non-compliance was "intentional or willful," id. § 552a(g)(4); (3) that defendant's non-compliance had an "adverse effect" on the plaintiff, id. § 552a(g)(1)(D); and (4) that the plaintiff suffered actual damages or is otherwise entitled to an award of damages, id. § 552a(g)(4). Failure to satisfy any one of these preconditions precludes recovery, and may divest the court of jurisdiction to hear such a cause of action. *Albright v. United States*, 732 F.2d 181, 184 (D.C.Cir. 1984).

Defendant casts into serious doubt plaintiff's ability to establish a number of the elements of a colorable Privacy Act claim for money damages. Giving us most pause in the present context are the first two prongs, the first of which requires us to ascertain whether it was "practicable" for the Division to seek leave information directly from plaintiff, and the second of which places the burden on plaintiff of demonstrating that the government's actions were "intentional or willful." 5 U.S.C. §§ 552a(e)(2), 552a(g)(4); *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C.Cir.1987). Courts have devoted considerable attention to ascertaining the meaning and scope of "intentional or willful" as used in the Privacy Act. A number of courts have looked first to language in that portion of the Act's legislative history which provides that the standard for recovery of damages under this provision is "somewhat greater than gross negligence." Analysis of House and Senate Compromise Amendments to the Federal Privacy Act, *reprinted in* 120 Cong.Rec. 40,405, 40,406 (1974); *see Laningham, supra,* 813 F.2d at 1242; *Moskiewicz v. Department of Agriculture*, 791 F.2d 561, 563 (7th Cir.1986). As interpreted by the Court of Appeals for the District of Columbia Circuit, this lan-

**2.** Plaintiff's motion technically seeks only partial summary judgment, since neither party has addressed the issue of damages to be recovered in the event that liability is established.

guage does not make the government "strictly liable for every affirmative or negligent action that might be said technically to violate the Privacy Act's provisions." *Albright, supra,* 732 F.2d at 189. Nor is it sufficient under the Act to demonstrate that the agency's conduct was not "inadvertent." *Id.; Laningham,* 813 F.2d at 1242. Instead, plaintiff must establish that the agency "flagrantly disregarded" one's rights under the Act, or acted "without grounds for believing [its actions] lawful." *Id.; Albright,* 732 F.2d at 189.

In support of its actions, the government contends that Waters' superiors reasonably believed it to be impracticable to obtain information directly from Waters pertaining to his use of the February leave time. Pursuant to court order of August 21, 1987, the Divisions has submitted under seal affidavits of James Bennett and Kathleen Murphy, as well as accompanying exhibits relevant to this incident.[3] These materials reveal that defendant's contact with the Pennsylvania Board of Law Examiners was not an isolated event, but, as discussed above, was part of a larger inquiry into plaintiff's use of leave granted for discrete purposes. The documents raise doubts as to plaintiff's actual use of the March 1986 leave period during which he was to make himself available for jury duty. They also reflect the Division's concern, given these reasonable doubts, that Waters might not be a credible source of information relevant to the February 1986 leave period.

■ The government having established, as a preliminary matter, that eliciting information from a third party was not inconsistent with the Privacy Act, the burden now shifts to plaintiff to raise a genuine issue of material fact as to whether the Division compiled information directly from plaintiff "to the greatest extent practicable," and whether such action, even if inconsistent with this initial requirement, constituted a willful or intentional violation of plaintiff's rights under the Act. Fed.R. Civ.P. 56; *Laningham, supra,* 813 F.2d at

1242 (employing burden-shifting approach articulated in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)). Plaintiff contends that the Division could readily have verified his presence at the bar examination by requesting that he produce documentary proof of his attendance. It is fair to assume, as plaintiff contends, that officers of the Civil Rights Division of the Justice Department, an entity with no shortage of lawyers, are cognizant of the highly formalized, strictly regulated context in which bar examinations are administered. Examinees are admitted to the examination room only on presentation of a pass or ticket which establishes their identity and right to attend, and later receive written correspondence informing them of their exam results. Plaintiff claims that he retains these documents, and would have promptly divulged them upon request. In short, plaintiff argues that the existence of objective documentary proof undermines defendant's reliance on the plaintiff's alleged non-credibility as a source of information.

■ Plaintiff's argument, though not without appeal, is unpersuasive in the present context. First, courts in identical contexts have recognized that at least one purpose of securing third-party confirmation of information is to prevent against falsification of even official documents. *See, e.g., Alexander v. Internal Revenue Service,* No. 86–0414, Memorandum Opinion at 14 (D.D.C. June 30, 1987) (agency acted reasonably in soliciting third-party information before confronting subject of investigation, since the subject could induce others to falsify records). Moreover, the reasonableness of the agency's conduct, and, in particular, whether it was "impracticable" to elicit information from plaintiff, must be judged at least in part from the perspective of the investigators. *Merola v. United States Department of Treasury,* No. 83–3323, Memorandum Opinion at 9 (D.D.C. October 24, 1986); *Alexander, supra.* Defendant's representations amply

---

**3.** The court's order authorizing filing under seal permitted exchange of these documents between counsel of record and their employees, but pro-

hibited communication to "any person" of the information contained therein. Order of August 21, 1987.

demonstrate that Waters' superiors had justifiable grounds for doubting the credibility of information they might obtain from plaintiff. Moreover, plaintiff makes no effort to rebut defendant's factual allegations pertaining to his use of the March leave period which gave the agency pause.

At the very least, defendant's conduct would not support a finding of "willful or intentional" violation of the Act or of plaintiff's rights thereunder. The Division's decision to elicit information first from the Pennsylvania Board of Law Examiners before confronting plaintiff himself was premised upon reasonable doubts as to plaintiff's veracity, as well as findings of possible impropriety in the use of subsequent leave periods.[4] At worst the Department's conduct in this affair arguably reflected bad judgment, but judgment within the realm of reason nonetheless. In other words, the decision "turn[ed] on 'judgment calls' or 'honest disputes,'" neither of which rise to the level of "flagrant disregard" of rights secured under the Act. *Alexander v. Internal Revenue Service,* Memorandum Opinion at 15 (quoting *Moskiewicz v. Department of Agriculture, supra,* 791 F.2d at 566).[5]

For the foregoing reasons, plaintiff has failed to establish a genuine issue of material fact as to whether defendant's actions in investigating plaintiff's use of leave were intentional or willful as those terms are defined under the Privacy Act. More generally, plaintiff has not demonstrated that the agency violated his rights protected by the Privacy Act, even when the evidence presented is viewed in a light most favorable to him. Courts have demonstrated a willingness to dispose of issues of intent and willfulness at the summary judgment stage in the context of Privacy

Act claims when, as here, a plaintiff plainly cannot satisfy the oft-cited standard contemplated by the Act. *See, e.g., Moskiewicz, supra,* 791 F.2d at 566; *Perry v. Block,* 684 F.2d 121 (D.C.Cir.1982); *Doe v. General Services Administration,* 544 F.Supp. 530 (D.Md.1982).

Accordingly, it is by the court this 22nd day of April, 1988

ORDERED that plaintiff's motion for summary judgment is hereby denied, and it is

ORDERED that defendant's cross-motion for summary judgment is hereby granted, and it is

FURTHER ORDERED that this case shall stand dismissed.

---

**4.** Of course, the Division had no occasion to request similar information from plaintiff *after* its correspondence with the Law Examiners. Since the third party confirmed plaintiff's attendance at the February 1986 examination, the agency was satisfied that this leave period was properly utilized, and hence was in no position to initiate any "adverse" action against plaintiff on this ground.

**5.** Moreover, the Division's actions were not inconsistent with guidelines on the Privacy Act

promulgated by the Office of Management and Budget, which, *inter alia,* recognize the "need to insure the accuracy of the information supplied by an individual by verifying it with a third party...." Office of Management and Budget Guidelines, 40 Fed.Reg. 28949, 28961 (1975). In the instant case, government supervisors sought to "insure the accuracy of the information supplied" by plaintiff in requesting leave, and did so by confronting a third party.